## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ABINGDON DIVISION

| | | |
|---|---|---|
| **TERESEA G. BOWMAN,** | ) | Civil Action No. 1:06cv00074 |
| Plaintiff, | ) | |
| | ) | **MEMORANDUM OPINION** |
| v. | ) | |
| | ) | |
| **MICHAEL J. ASTRUE**, | ) | By: Pamela Meade Sargent |
| **Commissioner of Social Security,**[1] | ) | United States Magistrate Judge |
| Defendant. | ) | |

In this social security case, this court affirms the final decision of the Commissioner denying benefits.

## I. Background and Standard of Review

Plaintiff, Teresea G. Bowman, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C. § 423 and § 1381 *et seq.* (West 2003 & Supp. 2006). This court has jurisdiction in this case pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3). This case is before the undersigned magistrate judge upon transfer pursuant to the consent of the parties under 28 U.S.C § 636(c)(1).

---

[1] Michael J. Astrue became the Commissioner of Social Security on February 12, 2007, and is, therefore, substituted for Jo Anne B. Barnhart as the defendant in this suit pursuant to Federal Rule of Civil Procedure 25(d)(1).

-1-

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Bowman protectively filed her applications for DIB and SSI on or about January 12, 2004, alleging disability as of October 7, 2001, based on chronic pain, fibromyalgia, arthritis in the lower back, depression, obesity, migraines, asthma, high blood pressure, a 25 percent disability in the left shoulder and tremors in the hands, arms, legs and feet. (Record, ("R."), at 15, 27, 42, 53-56, 58, 65, 270-75, 277, 283.) Her claims were denied initially. (R. at 15, 27-31, 279-81.) After her claims were initially denied, Bowman added claims of increased pain, vertigo and carpal tunnel syndrome in her right hand and wrist. (R. at 42, 85, 283.) Bowman's claims were then denied upon reconsideration. (R. at 15, 41-43, 283-85.) As a result, Bowman requested a hearing before an administrative law judge, ("ALJ"). (R. at 15, 37.) The ALJ held a hearing on December 21, 2005, at which Bowman was represented by counsel. (R. at 15, 286-322.)

By decision dated March 20, 2006, the ALJ denied Bowman's claims. (R. at 15-24.) The ALJ found that Bowman met the disability insured status requirements

of the Act for DIB purposes through June 30, 2004. (R. at 15, 17.) The ALJ determined that Bowman had not engaged in substantial gainful activity at any time relevant to this decision. (R. at 17.) The ALJ also concluded that the medical evidence in the record established that Bowman suffered from severe impairments, namely fibromyalgia, an affective disorder and morbid obesity, but he found that Bowman did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 17-20.) Furthermore, the ALJ found that Bowman's statements concerning the intensity, duration and limiting effects of her symptoms were not entirely credible. (R. at 22.) The ALJ found that Bowman had the residual functional capacity to perform a significant range of simple, light work[2] that allowed her a sit/stand option, that allowed her to change positions several times during the workday and that did not involve more than occasional climbing, crawling, crouching, stooping, balancing and kneeling. (R. at 20-22.) The ALJ determined that Bowman could not perform any of her past relevant work, including her work as a bookkeeper. (R. at 22.) The ALJ noted that transferability of skills was not material to the determination of this case because of Bowman's age. (R. at 22.) As a result of these findings, and the testimony of a vocational expert, the ALJ concluded that, based on her age, education, work experience and residual functional capacity, Bowman could perform jobs existing in significant numbers in the national economy, including those of a mail sorter, a laundry folder, a shirt presser and a garment bagger. (R. at 23.) Therefore, the ALJ found that Bowman was not under a disability as defined in the Act and that she was not eligible for benefits. (R. at 23-24.) *See* 20 C.F.R. §§

---

[2] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds; if someone can do light work, she also can do sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2006).

-3-

404.1520(g), 416.920(g) (2006).

After the ALJ issued his decision, Bowman pursued her administrative appeals. (R. at 10-11.) The Appeals Council denied her request for review on May 5, 2006. (R. at 7-9.) Bowman then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2006). The case is before this court on the Commissioner's motion for summary judgment filed on December 11, 2006, (Docket Item No. 11).[3]

## II. Facts

Bowman was born in 1972. (R. at 17, 53-54, 270-71, 290.) Thus, pursuant to 20 C.F.R. §§ 404.1563(c), 416.963(c), Bowman is considered a "younger person." At the time of her hearing, Bowman was married and had two dependent children living with her. (R. at 291.) Bowman received a high-school education and also received training in Windows 95 and hairdressing, as well as training to become a certified nurse's aide, ("CNA"). (R. at 17, 64, 292-93.) She had past work experience as a certified nurse's aid, a hairdresser, an assistant manager of a book store and a cashier. (R. at 59, 67-73, 293-94.)

At her hearing on December 21, 2005, Bowman testified that she was approximately 70 inches tall and weighed approximately 350 pounds. (R. at 17, 290.) Bowman also testified that she had not worked since 2001. (R. at 293-94.) She stated that she had been employed as a CNA until 1999 when she could no longer perform the lifting that the occupation required. (R. at 293.) She recalled that she was most

---

[3] Bowman did not file a motion for summary judgment in this case.

-4-

recently employed as an assistant manager of a book store, a position from which she was terminated for allegedly falsifying her time cards. (R. at 294.) After her termination, Bowman testified that she filed for unemployment compensation, which was denied allegedly because she could not attend the unemployment hearing. (R. at 294-95.)

Bowman stated that she had never been hospitalized for anything other than childbirth. (R. at 295.) She also admitted that her family doctor, Dr. Steven Huff, M.D., had never recommended that she be hospitalized for any reason. (R. at 297.) Bowman testified that she was not being treated by a psychiatrist or a psychologist, and she had never been treated by one during the time that she met the disability insured status requirements of the Act. (R. at 296.) Bowman further testified that she visited Brian E. Warren, Ph.D., a licensed clinical psychologist, on one occasion at the insistence of her attorney, not on the instruction of any medical professional. (R. at 297.) At this point in the hearing, the ALJ noted that he would not consider Warren to be a treating physician. (R. at 297.) Instead, the ALJ indicated that he would "consider [Warren's opinion] for whatever it's worth which is about the same as I'll consider a state agency consultive examination." (R. at 297.) In response, Bowman's attorney indicated that Warren did perform some objective testing; however, the ALJ simply reiterated that he would give Warren's opinion the same weight he would give a state agency consultative examination. (R. at 297-98.)

Bowman testified that she could stand for only five minutes. (R. at 298.) In response, the ALJ commented that she had to stand and walk more than five minutes to get into the building for her hearing. (R. at 298.) Bowman then responded that she could walk for 10 minutes and sit for 30 minutes. (R. at 298.) However, upon

questioning by the ALJ about how she was able to endure the long car trip to attend the hearing, Bowman again revised her statement and indicated that she could sit for 45 minutes.  (R. at 298.)

Bowman stated that she was unable to carry a package of 24 soft drinks due to a shoulder injury.  (R. at 298-99.)  She further stated that she had been restricted from lifting items weighing more than 25 pounds with her left arm ever since she had left shoulder surgery.  (R. at 299.)  However, she testified that no doctor had ever placed a limitation on her right side or on her ability to sit, stand or walk for any period of time.  (R. at 299.)  Nonetheless, Bowman stated that she was unable to perform these tasks because of pain.  (R. at 299.)

Bowman noted that she read two to three hours every day, and that she had no difficulty with reading and following the text.  (R. at 300, 303.)  She also stated that she did not have any problems writing, and that she wrote notes on a daily basis.  (R. at 300.)  Bowman testified that, at times, she was able to cook, but she could not wash dishes, sweep, mop, vacuum, do laundry or garden work due to pain when she stood or walked.[4]  (R. at 300-01, 304.)  However, she stated that no doctor had ever placed any limitation on her ability to  perform tasks that involved standing or walking, and that no doctor had ever recommended surgery to deal with her alleged pain. (R. at 301.)

Bowman stated that she had difficulty dressing herself.  (R. at 302.)  She noted

---

[4] Although Bowman testified at her hearing that she could not load the dishwasher, unload the dishwasher, or perform other household chores, (R. at 300-01), in her activities of daily living questionnaire submitted to Disability Determination Services, ("DDS"), Bowman stated that she performed household chores including loading the dishwasher daily.  (R. at 76.)

that she could not take a bath or shower by herself.  (R. at 302.)  Bowman indicated that she needed help to step into the bathtub or shower.  (R. at 309.)  She stated that, as a result, there were days when she would simply give herself a sponge bath out of the sink.  (R. at 309.)  Bowman further testified that she had lost interest in her appearance.  (R. at 309.)

Bowman described her daily routine as waking up at 6:30 a.m. to help get her daughter off to school.  (R. at 302.)  After her daughter left for school she would lie down for about two hours until her son awoke.  (R. at 302, 310.)  She then fixed herself breakfast, watched television and read with her son until lunchtime.  (R. at 303.)  After lunch, she typically sat down and colored or watched television with her son.  (R. at 303.)  Bowman estimated that she watched, or at least partially watched, television 12 to 14 hours per day.  (R. at 303-04.)  However, she claimed to have difficultly concentrating on the storylines of the television programs.  (R. at 304.)

Bowman indicated that the reasons she believed that she could not work were her pain and fibromyalgia related problems, such as muscle spasms in her limbs.  (R. at 304.)  She also noted that she had problems with depression and anxiety attacks caused by stress.  (R. at 305.)  Bowman described her anxiety attacks as making her feel as if she was "ready to just punch somebody."  (R. at 306.)  The attacks also produced feelings of chest pain and difficulty breathing.  (R. at 306.)  She further testified that these episodes occurred on a weekly basis.  (R. at 306.)

Bowman also testified that she suffered from migraine headaches once or twice a week that were instigated by stress; however, Bowman testified that the frequency and severity of these headaches had not changed since 2001.  (R. at 307.)  Bowman

indicated that she was not on preventative medication for this problem, but that she had medication to treat the headaches, which alleviated her pain, but would "knock [her] out" for seven to nine hours. (R. at 307.) Bowman added that she had difficulty sleeping, and that her various medications caused weight gain, memory loss, concentration problems and sexual side effects. (R. at 308.)

Despite her impairments, Bowman indicated that she still played the piano and painted,when her hands were not "jerking." (R. at 308.) However, she noted that her impairment had caused her to stop some of her volunteer activities such as being a youth leader in her church, a Girl Scout leader and a volunteer at her daughter's school. (R. at 308.) Additionally, Bowman stated that her social life had changed and that she no longer spent as much time socializing with friends. (R. at 310.)

Bowman testified that she had difficulty dealing with stress since she lost her job in February 2001. (R. at 310-11.) She indicated that losing her job caused her to have a nervous breakdown, and that she had not be able to cope with stress effectively since that time. (R. at 311.)

A vocational expert, Olen J. Dodd, M.A., a vocational expert, also testified at Bowman's hearing. (R. at 311-21.) Dodd indicated that Bowman's prior work as a cashier and a bookkeeper was semiskilled and sedentary[5] or light, depending on the particular circumstance. (R. at 312-14.) Dodd also stated that Bowman's prior work

---

[5] Sedentary work involves lifting items weighing no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools. *See* 20 C.F.R. §§ 404.1567(a), 416.967(a) (2006).

as a CNA was medium.[6]  (R. at 313.)  Dodd testified that there were some transferable skills from Bowman's prior employment, namely patient care skills, money skills and math skills.  (R. at 314.)  The ALJ then asked Dodd to assume a hypothetical individual of Bowman's age, education, background and experience, who was limited to lifting items weighing up to 20 pounds occasionally, lifting items weighing up to 10 pounds more frequently, occasionally standing, occasionally climbing ramps and stairs, but not ladders, ropes or scaffolds, and occasionally balancing, stooping, kneeling and crawling.  (R. at 315.)  The ALJ also indicated that the hypothetical individual had no visual, environmental or manipulative limitations through the range of activity previously described.  (R. at 315.)  Dodd testified that these limitations would preclude the individual from performing the individual's past work as a CNA, however, the individual's prior work as a cashier or bookkeeper would still be within the individual's residual functional capacity.  (R. at 315.)

The ALJ next asked Dodd about an individual with the previously outlined restrictions who also was limited in the manner outlined in Warren's report.[7]  (R. at 315-16.)  Dodd testified that this hypothetical individual would continue to be

---

[6] Medium work involves lifting items weighing up to 50 pounds with frequent lifting or carrying of objects weighing up to 25 pounds.  If someone can do medium work, she also can do light work or sedentary work.  *See* 20 C.F.R. §§ 404.1567(c), 416.967(c) (2006).

[7] The limitations described by Warren in his report were that Bowman was slightly limited in her ability to understand, remember and carry out short, simple instructions and to make judgments on simple work-related decisions.  (R. at 210.)  Warren indicated that Bowman was moderately limited in her ability to understand, remember and carry out detailed instructions, to interact appropriately with the public, to interact appropriately with supervisors, to interact appropriately with co-workers and to respond appropriately to changes in a routine work setting.  (R. at 210-11.)  Warren noted that Bowman had a marked limitation in her ability to respond appropriately to work pressures in a usual work setting.  (R. at 211.)  However, Warren found Bowman able to manage benefits in her own best interest.  (R. at 211.)  Warren noted that Bowman had some limitation in her ability to control her emotions and poor concentration, but Warren did not indicate that these were significant limitations.  (R. at 211.)

-9-

employable in a simple, low-stress job, even with the limitations on her ability to deal with work pressures indicated in Warren's report. (R. at 316.) Dodd indicated that this hypothetical individual could perform a full range of low-stress, unskilled light work. (R. at 316.) Based on this finding, Dodd determined that such an individual could perform jobs existing in significant numbers in the national economy, including those of a nonpostal mail sorter, a children's attendant, a laundry folder, a shirt presser and a garment bagger. (R. at 317-18.) Dodd then reiterated that there was nothing in Warren's report that would negatively impact the hypothetical individual's ability to perform these selected jobs. (R. at 319.)

Dodd was questioned by Bowman's attorney about the same hypothetical individual with the additional assumption that the individual experienced migraine headaches once or twice a week, which would require "down time of about one to two hours." (R. at 319.) Dodd testified that if these headaches occurred exclusively during the workday, on a consistent basis and were so severe that the individual would need to remove herself from the task she was performing, this limitation could render the individual nonproductive. (R. at 319-20.) Dodd also speculated that migraine headaches would be significantly less of a problem assuming that only one-third of them would occur during work hours. (R. at 320.) He stated that, in this situation, migraine headaches would not impact the individual's ability to perform the type of work previously described. (R. at 320-21.)

In rendering his decision, the ALJ reviewed records from Greensboro Orthopaedic Center, ("GOC"); Northern Hospital of Surry County; Dr. Mohammed Athar, M.D.; Tri-Area Heath Clinic, ("TAHC"); Eugenie Hamilton, Ph.D., a state agency psychologist; R. J. Milan Jr., Ph.D., a state agency psychologist; Dr. Robert

-10-

O. McGuffin, M.D., a state agency physician; Dr. Michael J. Hartman, M.D., a state agency physician; Brian E. Warren, Ph.D., a licensed clinical psychologist; Tri-State Health Clinic; and Northwest Medical Partners.

Bowman submitted some medical records dating prior to her alleged onset date of disability, October 7, 2001. These records indicate that Bowman began receiving treatment from Northwest Medical Partners and Dr. D. Nelson Gardner, M.D., as a family doctor starting in 1996. (R. at 245.) In July and August of 1996, Bowman requested and was prescribed Prozac by Dr. Gardner to treat "acute depression" caused by martial problems. (R. at 244-45.) However, after Bowman began treatment with Prozac, Dr. Gardner did not document any further problems with depression until February 2001. (R. at 218.)

In September 1996, Bowman presented to Dr. Gardner complaining of migraine headaches. (R. at 244.) She received an injection of Imitrex which greatly improved her headache, and she was prescribed Imitrex tablets. (R. at 244.) Bowman continued to receive periodic treatment for migraines, asthma and bronchitis until November 2001; however, Dr. Gardner never placed any limitations on her ability to work based on these conditions. (R. at 214-44.)

In March of 1997, Bowman received treatment for stress and anxiety related to her marital problems and was prescribed Xanax. (R. at 237.) By her next visit in April 1997, Dr. Gardner noted that Bowman had greatly improved with medication and that she and her husband were working things out. (R. at 237.) Following this treatment, Dr. Gardner did not document any other episodes or symptoms of anxiety. (R. at 214-36.)

Beginning in February 1998, Bowman began to complain of lower back pain and was diagnosed with lumbar radiculopathy. (R. at 232.) Dr. Gardner continued to treat Bowman's complaints of pain, including back pain, lower back pain, neck pain, leg pain, muscle aches and left shoulder pain until November 2001. (R. at 219-22, 224, 226-27, 229, 231-32.) This treatment included physical therapy during February and March of 1998. (R. at 254-59.) This physical therapy was successful in reducing Bowman's pain from a seven on 10-point scale to a one or a two so that Bowman could return to work as a CNA. (R. at 258-59.) However, following the physical therapy, Bowman continued to have periodic "flare-ups" of back pain. (R. at 220, 222, 227, 229.) Dr. Gardner never placed any limitations on Bowman's ability to work based on any of her reported pain.

In February 2001, Dr. Gardner documented Bowman's first symptoms of depression since 1996, which were brought on by Bowman being fired from her job the same day her uncle passed away. (R. at 218, 245.) However, after treatment with medication, there is no record by Dr. Gardner that Bowman experienced any further symptoms of depression. (R. at 214-17.) Dr. Gardner never placed any limitations on Bowman's ability to work based on depression, stress or anxiety.

Bowman's records also documented that she received treatment from the GOC prior to the alleged onset of her disability for problems that arose in her left shoulder from April 16, 1998, through January 15, 1999. (R. at 108-28.) Records from the GOC during this time period indicate that Bowman received prior treatment on her left shoulder including Cortisone injections, anti-inflammatory injections and physical therapy. (R. at 126.) During Bowman's treatment by GOC, she received additional injections and two outpatient, arthroscopic surgeries. (R. at 122-23, 127.)

-12-

Following her surgery, Dr. R. Andrew Collins, M.D., recommended a permanent 25 percent limitation on the usage of her left arm, including limiting her usage of her left arm to below shoulder level activities. (R. at 108, 117.) Dr. Collins also stated that Bowman should be permanently restricted to light work with respect to her usage of her left arm. (R. at 108.) No other restrictions were placed on Bowman's ability to work. (R. at 108.) Dr. Collins indicated that Bowman could resume work in any job that allowed limited use of the left arm. (R. at 108.) Additionally, it was noted that Bowman had a "good tolerance" for jobs that required kneeling, sitting, standing, alternating sitting and standing postures and lifting items weighing up to 25 pounds. (R. at 109.) However, it also was noted that Bowman's "self-perception of her capabilities [was] less than her demonstrated capabilities." (R. at 110.)

Besides her visits to Dr. Gardner in November 2001, (R. at 215-17), the record contains numerous medical records during Bowman's alleged period of disability. Bowman first visited TAHC on May 15, 2002. (R. at 171.) In May, July and September 2002, Bowman was seen due to urinary tract infections. (R. at 168-71.) Bowman's records indicate that at these examinations she weighed between 314 and 328 pounds and that she was obese. (R. at 168-71.) Additionally, at her July 2002 examination, Bowman complained of chronic back pain. (R. at 170.) However, at this examination, Dr. Almira U. Yusi-Lenn, M.D., indicated that Bowman suffered from no neurological deficit and the rest of her examination was unremarkable. (R. at 170.)

On April 30, 2003, Bowman returned to TAHC. (R. at 167, 169.) At this appointment, Bowman was treated for recurrent depression brought on by increased

-13-

stress related to family matters and for an increased frequency of her migraines. (R. at 167, 169.) Dr. Huff noted that Bowman was "mildly to moderately emotional," that she "gather[ed] herself well prior to the end of the visit" and that she was "[a]ppropriately distressed." (R. at 167.) Once again, Bowman was placed on Prozac. (R. at 167.) At Bowman's next visit to Dr. Huff, on May 12, 2003, he reported that Bowman's "depression has lifted on Prozac and she's nearly back to normal." (R. at 166.) Dr. Huff noted that Bowman's husband had noticed a difference, and that Bowman should remain on Prozac indefinitely. (R. at 166.)

Bowman returned to see Dr. Huff on July 28, 2003, for complaints of sinus problems. (R. at 165.) At this visit, Dr. Huff noted that Bowman had a history of "intermittent asthma, typically only with infection." (R. at 165.) Dr. Huff noted "[o]ther issues are currently stable." (R. at 165.) On October 7, 2003, Bowman returned to see Dr. Huff for a follow-up appointment regarding, among other things, her anxiety, depression and hypertension. (R. at 163). Dr. Huff noted that her hypertension was well-controlled at home, she had no asthmatic symptoms and no problems with her chronic back pain. (R. at 163.) Dr. Huff also noted that her depression and anxiety had a predictable seasonal exacerbation in the fall and winter. (R. at 163.) As a result, he increased her dosage of Prozac for the winter months. (R. at 163.)

On December 11, 2003, Bowman returned and reported, among other things, that she had a history of body pain of undetermined cause and that a previous doctor had hinted at fibromyalgia. (R. at 162.) Bowman stated that some days she experienced no pain at all and other days it caused her to need help getting out of bed. (R. at 162.) Dr. Huff noted that Bowman's depression was "much improved" due to

-14-

the increase in Prozac and that Bowman stated that "for the first Christmas in a long time she won't be the [G]rinch." (R. at 162.)

On December 31, 2003, Dr. Huff reported that Bowman returned complaining of increased pain in her shoulders and neck, which she believed was caused by "walking long distances while Christmas shopping." (R. at 161.) Dr. Huff noted that she was experiencing "mild discomfort" and gave her an injection into the occipital nerve tender point, which produced "immediate improvement in her symptoms." (R. at 161.) Dr. Huff diagnosed her with fibromyalgia syndrome, which could require periodic trigger point injections but he stated that these would be "highly effective." (R. at 161.) At Bowman's follow-up for fibromyalgia syndrome on January 12, 2004, she noted that her headache and neck pains had been resolved by the injection and had not returned. (R. at 158.) She indicated that she experienced a "flare-up" of pain in her hips and legs that occurred "every once an a while." (R. at 158.) However, Dr. Huff noted that an examination of her lower extremities revealed no fasciculations, her muscle mass and tone were normal and her reflexes were 2+ and symmetrical at both the Achilles' tendon and patellar tendon. (R. at 158.) Dr. Huff noted that she rose from her chair and climbed onto the exam table without difficulty. (R. at 158.) Finally, Dr. Huff indicated that a spine film taken of Bowman which revealed small anterior spurs on L4, L3 and L2, as well as mild straightening and mild narrowing of the L4 and L5 disc space. (R. at 158.) Dr. Huff also noted that Bowman's alignment was good and her disc spaces were maintained. (R. at 158.)

On February 4, 2004, Bowman returned to Dr. Huff and indicated that she was "doing much better than before, with a decrease in her general pain level and improvement in her state of mind." (R. at 157.) She informed Dr. Huff that her

-15-

asthma, migraines and anxiety were all controlled. (R. at 157.) She also informed Dr. Huff that she was seeking disability. (R. at 157.) Dr. Huff diagnosed her with lumbar disc disease and arthritis, but noted that the clinical picture was not consistent with spinal stenosis or radiculopathy. (R. at 157.) At this time, he offered Bowman magnetic resonance imaging, ("MRI"), for further investigation, but she declined. (R. at 157.)

Bowman returned to see Dr. Huff on June 3, 2004, complaining of exacerbation of her asthma with exertion. (R. at 156.) Dr. Huff documented a 19-pound weight gain and a weight of 348 pounds. (R. at 156.) Bowman noted that she was "getting out and walking more" and that her fibromyalgia was about the same. (R. at 156.) Dr. Huff noted that she was still markedly obese, but she was in no acute distress and she was breathing comfortably. (R. at 156.) Dr. Huff further added that there were no significant objective findings of any asthmatic exacerbation. (R. at 156.)

On June 21, 2004, Bowman complained of right hand and forearm pain that restricted her ability to play the piano at church. (R. at 155.) Upon examination at TAHC by Elizabeth Hubbard, FNP, it was noted that Bowman could supinate and pronate without difficulty both laterally and bilaterally. (R. at 155.) Bowman was diagnosed with carpal tunnel syndrome of the right wrist and was given a wrist brace to wear at night. (R. at 155.) Bowman returned on July 19, 2004, to follow up on an emergency room visit for vertigo and right ankle pain. (R. at 154.) Bowman indicated that when she regularly took her medication for vertigo, Antivert, it relieved her symptoms. (R. at 154.) Pain in her plantar surface was noted with flexion of her toes; as a result, she was diagnosed by Hubbard with plantar fasciitis. (R. at 154.)

-16-

On November 1, 2004, Bowman was again seen by Hubbard for complaints of pain from her waist down. (R. at 153.) Bowman believed that this was an exacerbation of fibromyalgia and, as a result, she had begun walking with a cane. (R. at 153.) Bowman denied any numbness or tingling, but Hubbard noted a slightly uneven gait. (R. at 153.) Hubbard diagnosed an exacerbation of fibromyalgia syndrome and encouraged nonweight-bearing exercise, diet and weight loss. (R. at 153.)

Bowman returned on December 8, 2004, with several complaints, including restless leg syndrome and low back pain. (R. at 150.) Bowman was prescribed additional medication to address the restless leg syndrome. (R. at 150.) Bowman returned to TAHC on March 9, 2005, and March 14, 2005, primarily to address gynecological problems and other issues unrelated to her allegedly disabling conditions. (R. at 147-49.) However, on March 9, 2005, Bowman did indicate that she was experiencing "some low back pain." (R. at 149.) No treatment was requested or required as a result of this complaint. (R. at 149.)

On June 22, 2004, Bowman was seen in the emergency room of Northern Hospital of Surry County for complaints of headaches, nausea and vertigo. (R. at 130-35.) Upon examination, no sensory or motor defects were noted, and no breathing difficulties were noted. (R. at 132.) She was alert and had a normal orientation and a normal mood/affect. (R. at 132.) Her extremities had a normal range of motion with no tenderness or pedal edema. (R. at 132.) A computerized axial tomography, ("CT"), scan of her brain was performed, and the results were found to be normal. (R. at 134.)

A consultative examination of Bowman was performed by Dr. Mohammed A. Athar, M.D., at the request of DDS on September 2, 2004. (R. at 136-46.) Dr. Athar indicated that Bowman's chief complaint was fibromyalgia. (R. at 136.) Bowman indicated that she had been diagnosed with fibromyalgia in October 2001. (R. at 136, 161.) Bowman complained that she had good and bad days and that on bad days she needed assistance to get out of bed and get dressed. (R. at 136.) However, Bowman indicated that she was still able to take care of her two-year-old son, but that it was more difficult on days when she was not feeling well. (R. at 136.) Bowman indicated that she had migraine headaches and asthma; but she indicated that these problems were controlled with medication. (R. at 138-39, 142-43.)

Additionally, Bowman claimed that she had constant problems with pain in her back, spine, knees, joints and muscles. (R. at 137, 139, 142.) However, Bowman did state that the medicines she took seemed to help her joint pain, but that she was never totally pain-free. (R. at 137, 142.) Upon examination, Dr. Athar noted that while Bowman had a "cautious walk" with a slight tilt to the right, she was not in acute distress. (R. at 140, 142.) Dr. Athar concluded that Bowman had some impairment in her ability to sit and moderate impairment in her ability to stand and walk. (R. at 143.) He noted no mental problems and stated that she was alert and cooperative, as well as oriented to time, place and person. (R. at 142.) Dr. Athar did not document any neurological, pulmonary, cardiac or abdominal problems. (R. at 140-42.)

The only problems Dr. Athar noted were musculoskeletal. (R. at 141-42.) He documented some tenderness to palpation and some limitation in Bowman's range of motion in her thoracic spine, her lumbosacral spine, her hips, knees and left shoulder. (R. at 141.) However, he noted that Bowman had a normal range of motion in her

-18-

right shoulder, good strength in both of her legs and no erythema or effusion.  (R. at 141.)  While Bowman claimed to have problems with pain in her fingers and difficulty using her hands, upon examination, Dr. Athar noted no erythema or effusion, no tenderness on palpation and no Heberden's nodes.[8]  (R. at 137, 142.)  Dr. Athar also noted that Bowman was able to make a tight fist with both hands, and that she had good strength in both hands.  (R. at 142.)

Additionally, Bowman asserted that she had significant problems with both of her knees and that at times her knees had given way causing her to fall.  (R. at 137.) However, at the request of Dr. Athar, an x-ray of Bowman's right knee was performed on September 2, 2004, which documented a "normal right knee."  (R. at 135, 143, 146.)  All of Bowman's bony and soft tissue structures were found to be intact and her joint space was well maintained.  (R. at 135, 143, 146.)  Dr. Athar noted that Bowman was grossly obese and that weight loss would help her arthralgias and myalgias.  (R. at 143.)  Finally, Dr. Athar noted that due to her complaints of pain in her joints and muscles, she would have difficulty doing any work outside of the home and that her prognosis was poor.  (R. at 143.)

Eugenie Hamilton, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), on September 15, 2004.  (R. at 177-89.) Hamilton concluded that Bowman suffered from an affective disorder, namely recurrent depression, that was not severe.  (R. at 177, 180.)  Hamilton indicated that Bowman had mild difficulties in maintaining concentration, persistence and pace.  (R.

---

[8]Heberden's nodes are bony prominences that occur at the smallest joint at the end of the fingers.  They develop as a result of inflammation that occurs in the bone under adjacent cartilage that has wear from osteoarthritis.  They can become inflamed at times and can be painful.  Http://www.medicinenet.com/script/main/art.asp?articlekey=79413.

at 187.)   However, she found that Bowman had no restrictions as to her activities of daily living and her ability to maintain social functioning based on her mental impairment.  (R. at 187.)  Hamilton also documented no episodes of decompensation.  (R. at 187.)   In support of these findings, Hamilton noted that Dr. Athar had found Bowman's mental state to be alert, cooperative and oriented.   (R. at 189.) Additionally, Hamilton noted Dr. Huff's treatment of Bowman and that her depression and anxiety were well-controlled with medication.  (R. at 189.)  Hamilton indicated that Bowman admitted activities of daily living including driving, going to church, going to doctor's appointments, cooking meals, loading the dishwasher, grocery shopping, playing piano, doing crossword puzzles, visiting with others and getting along with others. (R. at 189.) Finally, Hamilton indicated that Bowman's allegations were only partially credible.  (R. at 189.)  Hamilton's findings were affirmed by R. J. Milan Jr., Ph.D, another state agency psychologist, on December 17, 2004.  (R. at 177.)

Also on September 15, 2004, a physical residual functional capacity assessment, ("PRFC"), was completed by Dr. Michael J. Hartman, M.D., a state agency physician.  (R. at 190-96.)  Dr. Hartman concluded that Bowman could occasionally lift items weighing up to 20 pounds and frequently lift items weighing up to 10 pounds.  (R. at 191.)  He concluded that Bowman could stand or walk for a total of about six hours with normal breaks during an eight-hour workday.  (R. at 191.) He also concluded that Bowman could sit for a total of about six hours with normal breaks during a normal eight-hour workday.  (R. at 191.)  Furthermore, Dr. Hartman found Bowman unlimited in her ability to push and/or pull hand or foot controls within the limitations on her ability to lift and carry.  (R. at 191.)  He indicated that she could occasionally climb, balance, stoop, kneel, crouch and crawl.  (R. at 192.)

-20-

Additionally, he noted no manipulative, visual, communicative or environmental limitations. (R. at 192-93.)

Dr. Hartman also provided an explanation of his findings which indicated that, based on the medical records and Bowman's stated activities of daily living, her allegations were partially credible. (R. at 195.) Dr. Hartman indicated that Dr. Athar's findings were considered, and that aspects of Dr. Hartman's report were consistent with Dr. Athar's findings. (R. at 195-96.) Dr. Hartman stated that he agreed with Dr. Athar that Bowman had limitations on exertional and postural activities, but that Dr. Athar did not quantify those limitations. (R. at 196.) He further stated that Dr. Athar's statement that Bowman would have difficulty working outside of the home was not well-supported by the evidence in the record. (R. at 196.) Instead, Dr. Hartman indicated that his residual functional capacity assessment was more appropriate given the documentation provided in the record of Bowman's physical impairment. (R. at 196.) Dr. Hartman's assessment was affirmed, on December 16, 2004, by Dr. Robert O. McGuffin, M.D., another state agency physician. (R. at 196.)

At the request of her attorney, Bowman visited Brian E. Warren, Ph.D., a licensed clinical psychologist, for a psychological evaluation in relation to her disability claim on July 26, 2005. (R. at 206-09.) Warren described Bowman's mood as depressed with a normal affect, and he indicated that she was well-oriented and had no psychotic symptoms. (R. at 207.) Warren stated that Bowman was clinically and chronically depressed and had significant symptoms of anxiety without psychotic indicators. (R. at 208.) He also noted that her depression and pain interfered with many aspects of her daily functioning and that her tolerance for stress was extremely

poor.  (R. at 208.)  Warren performed a personality assessment inventory, which he stated was consistent with his interview findings.  (R. at 208.)  He also performed a pain patient profile, which indicated that Bowman experienced depression and anxiety in the above average range when compared with other pain patients.  (R. at 208.)  Warren indicated that Bowman may benefit from appropriate medication and treatment for depression and pain.  (R. at 208.)  She was diagnosed with severe, recurrent major depressive disorder, moderate generalized anxiety disorder and a personality disorder, not otherwise specified .  (R. at 208-09.)

On August 17, 2005, Bowman visited TAHC for complaints of a sinus infection, bowel problems, nerve problems and fibromyalgia.  (R. at 203.)  Bowman

Warren also completed an ability to do work-related mental activities assessment form.  (R. at 210-11.)  On this form, Warren indicated that Bowman was slightly limited in her ability to understand, remember and carry out short, simple instructions and to make judgments on simple work-related decisions.  (R. at 210.)  Warren indicated that Bowman was moderately limited in her ability to understand, remember and carry out detailed instructions, to interact appropriately with the public, to interact appropriately with supervisors, to interact appropriately with co-workers and to respond appropriately to changes in a routine work setting.  (R. at 210-11.)  Warren noted that Bowman had a marked limitation in her ability to respond appropriately to work pressures in a usual work setting.  (R. at 211.)  However, Warren found Bowman able to manage benefits in her own best interest.  (R. at 211.)  Finally, Warren noted that Bowman had some limitation in her ability to control her emotions and poor concentration, but Warren did not indicate that these were significant limitations.  (R. at 211.)

On August 17, 2005, Bowman visited TAHC for complaints of a sinus infection, bowel problems, nerve problems and fibromyalgia.  (R. at 203.)  Bowman

complained of unspecified aches and pains associated with fibromyalgia and requested a refill of her pain medication. (R. at 203.) As a result, Bowman was switched from Ultram to Ultracet. (R. at 203.) Upon examination, no depression was noted or diagnosed. (R. at 203.) Situational anxiety was diagnosed and temporary medication was prescribed. (R. at 203.) On August 24, 2005, and August 29, 2005, Bowman did not show up for scheduled lab work. (R. at 204, 213.) On September 26, 2005, she requested high powered antibiotics; however, there was no indication of any problems with fibromyalgia, pain or mental health problems. (R. at 213.)

## III. Analysis

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2006); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920 (2006). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in the process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2006).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the

claimant maintains the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2), 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2006); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated March 20, 2006, the ALJ denied Bowman's claims. (R. at 15-24.) The ALJ found that Bowman met the disability insured status requirements of the Act for DIB purposes through June 30, 2004. (R. at 15, 17.) The ALJ determined that Bowman had not engaged in substantial gainful activity at any time relevant to this decision. (R. at 17.) The ALJ also concluded that the medical evidence in the record established that Bowman suffered from severe impairments, namely fibromyalgia, an affective disorder and morbid obesity, but he found that Bowman did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 17-20.) Furthermore, the ALJ found that Bowman's statements concerning the intensity, duration and limiting effects of her symptoms were not entirely credible. (R. at 22.) The ALJ found that Bowman had the residual functional capacity to perform a significant range of simple light work that allowed her a sit/stand option, that allowed her to change positions several times during the workday and that did not involve more than occasional climbing, crawling, crouching, stooping, balancing and kneeling. (R. at 20-22.) The ALJ determined that Bowman could not perform any of her past relevant work, including her work as a bookkeeper. (R. at 22.) The ALJ noted that transferability of skills was not material to the determination of this case because of Bowman's age. (R. at 22.) As a result of these findings, and the testimony of a vocational expert, the ALJ concluded that, based on

-24-

her age, education, work experience and residual functional capacity, Bowman could perform jobs existing in significant numbers in the national economy, including those of a mail sorter, a laundry folder, a shirt presser and a garment bagger. (R. at 23.) Therefore, the ALJ found that Bowman was not under a disability as defined in the Act and that she was not eligible for benefits. (R. at 23-24.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2006).

The plaintiff argues that the ALJ's decision is not supported by substantial evidence. Specifically, Bowman argues that the ALJ improperly negated the examination of Dr. Athar. (Brief In Support Of Plaintiff's Motion For Summary Judgment, ("Plaintiff's Brief"), at 4-7.) Bowman also argues that the ALJ improperly discounted the report and psychological examination of Warren. (Plaintiff's Brief at 7-9.)

The court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided that his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Bowman's first argument is that the ALJ improperly discounted the opinion of Dr. Athar, who performed a consultative examination at the request of DDS.

(Plaintiff's Brief at 4-7.)  Bowman further asserts that the opinion of Dr. Athar was not refuted in the record, and that the ALJ had no evidence to support his finding that Bowman could perform light work.  (Plaintiff's Brief at 6.)  This argument is without merit.

It is well-settled that the ALJ has a duty to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein.  *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). While an ALJ may not reject medical evidence for no reason or for the wrong reason, see *King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(d), 416.927(d), if he sufficiently explains his rationale and if the record supports his finding.

Additionally, the Fourth Circuit has noted that "[c]ircuit precedent does not require that a treating physician's testimony 'be given controlling weight;'" however, if the opinion "is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig v. Charter*, 76 F.3d 585, 590 (4th Cir. 1996) (quoting *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992)).  "[T]he testimony of a non-examining physician can be relied upon when it is consistent with the record." *Smith v. Schweiker*, 795 F.2d 343, 346 (4th Cir. 1986) (citing *Kyle v. Cohen*, 449 F.2d 489, 492 (4th Cir. 1971)). Furthermore, under 20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2), an ALJ is not bound by the findings of any medical source on a claimant's residual functional capacity. Instead, the responsibility for determining a claimant's residual functional capacity rests with the ALJ, and the ALJ can determine the value to give to a medical source's

opinions according to the factors listed in 20 C.F.R. §§ 404.1527(d), 416.927(d).

In this case, contrary to Bowman's assertion, Dr. Athar's conclusions are controverted in the record.  (Plaintiff's Brief at 6.)  Dr. Athar noted in his report that, due to Bowman's musculoskeletal problems and her complaints of pain in her joints and muscles, she would have difficulty doing any work outside of the home, and that her prognosis was poor.  (R. at 143.)  However, these conclusions appear to be largely based on Bowman's subjective complaints rather than Dr. Athar's own examinations, and these conclusions are contradicted by Dr. Athar's own findings.

Despite the numerous medical conditions relayed to Dr. Athar by Bowman, upon examination, Dr. Athar only documented musculoskeletal problems.  (R. at 141-43.)  He noted some tenderness to palpation and some limitation in Bowman's range of motion in her thoracic spine, lumbosacral spine, hips, knees and left shoulder.  (R. at 141.)  However, he noted that Bowman had a normal range of motion in her right shoulder, good strength in both legs and no erythema or effusion.  (R. at 141.)  While Bowman claimed to have problems with pain in her fingers and difficulty using her hands, upon examination, Dr. Athar noted no erythema or effusion, no tenderness on palpation and no Heberden's nodes.  (R. at 137, 142.)  Dr. Athar also found that Bowman was able to make a tight fist with both hands and that she had good strength in both hands.  (R. at 142.)

Dr. Athar indicated that the various medications prescribed to Bowman appeared to help her joint pain and that she appeared to be in no acute distress.  (R. at 137, 140, 142.)  He noted no mental problems and stated that she was alert and cooperative, as well as oriented to time and place and person.  (R. at 142.)

-27-

Additionally, Dr. Athar did not document any neurological, pulmonary, cardiac or abdominal problems. (R. at 140-42.)

As a result of his observations of strictly musculoskeletal problems, Dr. Athar concluded that Bowman had "some impairment" in her ability to sit and "moderate impairment" in her ability to stand and walk. (R. at 143.) These statements were Dr. Athar's only objective findings documenting any work-related impairment and they do not appear consistent with Dr. Athar's conclusion that Bowman could not work outside of the house. Instead, this conclusion by Dr. Athar appears to be based primarily on Bowman's subjective complaints, not on objective findings. Thus, Dr. Athar's report is internally inconsistent with his own objective findings.

Furthermore, some of the subjective complaints and statements presented by Bowman to Dr. Athar, which were incorporated into Dr. Athar's report, were not factually documented in Bowman's medical records. For example, Bowman claimed to have been diagnosed with fibromyalgia in October of 2001, however, there is no evidence in her medical records of such a diagnosis until December 31, 2003. (R. at 136, 161.)

In addition, Bowman asserted to Dr. Athar that she had significant problems with both of her knees and that, at times, her knees had given way causing her to fall. (R. at 137.) There is no documentation in Bowman's treatment records of any severe knee problems causing her to fall during the relevant time period. In fact, she made no mention of knee problems when she was seen at TAHC a month and a half prior to Dr. Athar's examination, or when she was seen two months after Dr. Athar's examination. (R. at 153, 154.) Furthermore, there was no mention of any knee pain

when she visited the emergency room at Northern Hospital of Surry County two and a half months prior to Dr. Athar's examination. At this visit, Bowman was found to have a full range of motion in her extremities. (R. at 132.) Finally, based on Bowman's complaints, Dr. Athar ordered an x-ray of Bowman's right knee which documented a "normal right knee." (R. at 135, 143, 146.) All of Bowman's bony and soft tissue structures were found to be intact, and her joint space was well-maintained. (R. at 135, 143, 146.)

Besides the internal inconsistencies in Dr. Athar's report, virtually all of the other medical evidence in the record contradicts Dr. Athar's report. First, Bowman's treating sources did not prescribe the type of limitations that Dr. Athar indicated. Most notably, Bowman's treating physician, Dr. Huff, never placed any limitations on Bowman's ability to perform work-related functions. In fact, the only limitation ever placed on Bowman by a treating source was a limitation on her ability to use her left shoulder following arthroscopic surgery. (R. at 108, 117.) However, this limitation was placed on Bowman's nondominant arm more than two years prior to her alleged onset of disability, and Bowman continued to work for more than two years after this limitation was recommended. (R. at 59, 67, 108, 218.)

Similarly, the findings of the nonexamining sources in the record were inconsistent with Dr. Athar's determination that Bowman could not perform work outside of the house. In fact, Dr. Hartman and Dr. McGuffin, state agency physicians, actually disagreed with and discredited Dr. Athar's conclusion. (R. at 195-96.) Dr. Hartman explained that Bowman had admitted activities of daily living including driving, going to church, going to doctor's appointments, cooking meals, loading the dishwasher, grocery shopping, playing piano, doing crossword puzzles, visiting with

others and getting along with others. (R. at 195.)

As a result, Dr. Hartman explained that, based on Bowman's medical records and stated activities of daily living, her allegations were only partially credible. (R. at 195.) Dr. Hartman indicated that he considered Dr. Athar's findings in making his determinations, and that aspects of Dr. Athar's objective findings were consistent with his determinations. (R. at 195-96.) Dr. Hartman stated that he agreed with Dr. Athar that Bowman had limitations on exertional and postural activities. (R. at 196.) However, Dr. Hartman observed that Dr. Athar did not quantify those limitations with respect to Bowman's ability to perform work-related activities. (R. at 196.) He further stated that Dr. Athar's statement that Bowman would have difficulty working outside of the home was not well-supported by the evidence in the record. (R. at 196.) Instead, Dr. Hartman indicated that his residual functional capacity assessment was more appropriate given the documentation provided in the record by Bowman's treating sources and her activities of daily living. (R. at 196.) Therefore, the analysis by Dr. Hartman, which was affirmed by Dr. McGuffin, directly contradicted Dr. Athar's assertion that Bowman was unlikely to be able to work outside of the home.

The ALJ explained Dr. Athar's report in detail, (R. at 18.), and properly weighed all of the evidence presented before concluding that the weight of the evidence suggested a finding contrary to Dr. Athar. (R. at 22.) In making this determination, the ALJ stated that evidence from Bowman's treating sources demonstrated that, while she experienced chronic pain, it was not of a level that would preclude light work. (R. at 22.) Additionally, the ALJ properly considered Bowman's obesity and stated that this condition's impact was "taken into account in reaching the conclusions herein." (R. at 20.) As a result, the ALJ found that Bowman was capable

-30-

of performing simple, light work with a sit/stand option that allowed her to change positions several times during the day.  (R. at 20-21.)

The Fourth Circuit held in *Kyle*, 449 F.2d at 492, that the testimony of a nonexamining, or nontreating physician can be used and relied upon if it is consistent with the record.  Additionally, "if the medical expert testimony from examining or treating physicians goes both ways, an ALJ's determination coming down on the side on which the non-examining, non-treating physician finds himself should stand." *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984).  In this case, based on the analysis above, it is this court's opinion that substantial evidence exists to support the ALJ's determination that Bowman could perform light work.  While substantial evidence supports the ALJ's determination, evidence exists in the record from treating physicians and examining physicians that goes both ways. However, based on Fourth Circuit precedent, the ALJ's decision to follow the substantial evidence in the record and come down on the side of the nonexamining, nontreating source should not be disturbed.  *See Gordon*, 725 F.2d at 235.

Bowman's final argument is that the ALJ improperly discounted the report and psychological examination performed by Warren.  (Plaintiff's Brief at 7-9.)  In making this argument, the claimant asserts that the ALJ should have had a medical advisor present during the claimant's hearing. (Plaintiff's Brief at 7.)  Additionally, the claimant asserts that the ALJ improperly set aside the report of Warren because it was based on one visit at the request of the claimant's attorney. (Plaintiff's Brief at 7.)

These arguments are misplaced.  First, there is no requirement that the ALJ

-31-

must have a medical advisor present during a hearing, and the claimant cites no authority to the contrary. The ALJ does have a duty to develop the record. *See Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986). In *Cook*, the court stated that "the ALJ has a duty to explore all relevant facts and inquire into the issues necessary for adequate development of the record, and cannot rely only on evidence submitted by the claimant when that evidence is inadequate." 783 F.2d at 1173. However, the regulations require only that the medical evidence be "complete" enough to make a determination regarding the nature and effect of the claimed disability, the duration of the disability and the claimant's residual functional capacity. 20 C.F.R. §§ 404.1513(e), 416.913(e) (2006). It is this court's opinion that the record in this case was sufficient for the ALJ to properly make these determinations; thus, the ALJ had no duty to further develop the record.

Second, while the ALJ did discount the report and psychological examination performed by Warren, the ALJ's treatment was not improper, and Bowman cites no authority to the contrary. Pursuant to 20 C.F.R. §§ 404.1527, 416.927, the ALJ may consider a number of factors in deciding the weight to give any medical opinion. An examining source generally receives more weight than a nonexamining source, and a treating source generally receives more weight than an examining source or a nonexamining source. *See* 20 C.F.R. §§ 404.1527(d), 416.927(d) (2006). In making these decisions, the ALJ may consider a number of factors including the duration of the treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the findings and the consistency with the record. *See* 20 C.F.R. §§ 404.1527(d), 416.927(d) (2006).

In this case, the ALJ, in his opinion, clearly stated that Warren was not a

-32-

treating source because Warren examined Bowman on one occasion at the request of the claimant's attorney in preparation for the claim, not in the normal course of medical treatment and not to provide medical treatment. (R. at 19.) This determination by the ALJ was correct. Pursuant to 20 C.F.R. §§ 404.1527(d), 416.927(d), Warren is properly classified as an examining source, not a treating source. Additionally, contrary to Bowman's assertion, the ALJ properly considered Warren's findings, gave them the proper weight as records of an examining physician and discussed them in detail. (R. at 19.) The ALJ reviewed Warren's report and noted that while Warren diagnosed "major depression recurrent," he failed to document even one episode of "major depression." (R. at 19.) Additionally, the ALJ noted that the objective testing performed by Warren indicated only moderate limitations in Bowman's work-related abilities with the exception of a marked limitation on her ability to respond to work pressures in a usual work setting. (R. at 19.) Based on a review of this evidence, and a review of evidence from Bowman's treating sources and other nontreating sources, the ALJ concluded that Bowman did have severe mental impairments, namely an affective disorder and a personality disorder. (R. at 17, 20.) However, the ALJ found that these disorders were not disabling. (R. at 20-24.)

As previously noted, the testimony of a nonexamining or nontreating physician can be used and relied upon if it is consistent with the record. *See Kyle*, 449 F.2d at 492. Additionally, "if the medical expert testimony from examining or treating physicians goes both ways, an ALJ's determination coming down on the side on which the non-examining, non-treating physician finds himself should stand." *Gordon*, 725 F.2d at 235.

In this case, the ALJ adopted the findings of the state agency psychologists, and concluded that their findings were more consistent with the records of Bowman's treating physicians. (R. at 20-22.) It is this court's opinion that substantial evidence exists to support the ALJ's determination. While substantial evidence supports the ALJ's determination, evidence exists in the record from treating physicians and examining physicians that goes both ways. However, based on Fourth Circuit precedent the ALJ's decision to follow the substantial evidence in the record and come down on the side of the nonexamining, nontreating source should not be disturbed. *See Gordon*, 725 F.2d at 235. Furthermore, even if the ALJ had adopted Dr. Warren's report, the vocational expert testified that there still would be jobs available in significant numbers in the national economy which Bowman could perform. (R. at 315-16.)

## *V. Conclusion*

For the foregoing reasons, the Commissioner's motion for summary judgment will be granted, and the decision of the Commissioner denying benefits will be affirmed.

An appropriate order will be entered.

**DATED**:   This 30th day of March 2007.


/s/   *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE


-34-